**DATACARD CORPORATION, Plaintiff,**

v.

**KUNZ KG, Defendant.**

**KUNZ KG and Digicard Plastikkarten Druck–Und Codiersysteme GmbH, Counterplaintiffs,**

v.

**DATACARD CORPORATION, Counterdefendant.**

**Civ. A. No. 90–1517(GHR).**

United States District Court, District of Columbia.

Nov. 22, 1991.

Steuart H. Thomsen, Sutherland, Asbill & Brennan, Washington, D.C., for plaintiff.

Gene C. Lange, Ragan & Mason, Washington, D.C., for defendant.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

### I. Introduction

At issue in this case is U.S. Patent No. 4,650,350 (" '350"). The patent is in the field of thermal printing on plastic cards. Defendant and Counterplaintiff Kunz KG of Vienna, Austria ("Kunz") is the patent holder and Counterplaintiff Digicard Plastikkarten Druck–Und Codiersysteme GmbH ("Digicard") is the licensee of the patent. Plaintiff and Counterdefendant DataCard Corporation ("DataCard") manufactures printers that print on plastic cards.

DataCard has moved for summary judgment, seeking a declaratory judgment that its thermal printers do not infringe the '350 patent because they do not use an embossing foil as defined therein. DataCard fur-

ther seeks a declaration that the '350 patent is invalid for failure to comply with the command of 35 U.S.C. § 112, that claims have a definite meaning. Kunz and Digicard have countermoved for partial summary judgment against DataCard, claiming that DataCard's printers literally infringe claims 1, 2, 7, 8 and 10 of the '350 patent. The nub of this infringement claim is that the '350 patent does not limit the definition of an embossing foil to a distinctive three-layer construction defined in claims 11–13 of the patent, but embraces other constructions as well, including that used by Data-Card. Kunz and Digicard further contend that, if no literal infringement is found, a trial is required as to whether DataCard infringed the '350 patent under the "doctrine of equivalents." This Court has jurisdiction pursuant to 28 U.S.C. § 1338(a).

## II. The Invention

The facts, at least as they relate to literal infringement, are largely undisputed. The parties do not dispute that DataCard's printer system—its 15000 Ultima with an UltraGrafix module, UltraGrafix 800 and ImageCard printers—uses a thermal printing head and a "ribbon" or "foil" to print on plastic. The DataCard "ribbon" consists of a carrier on top of which is a single layer containing a mixture of resin and colorant. The precise structure of this ribbon is proprietary to Coding Products, who supply ribbons for the DataCard printing system above. Nubson Dep., Defs.' Mot. for Summ.J. at A385; Defs.' Opp'n to Pl.'s Mot. for Summ.J. at A586–588.

### A. *The '350 Patent*

The '350 patent was issued to Kunz on March 17, 1987. The inventor was Frank Dorner, the owner of both Kunz and Digicard. The '350 patent teaches the use of a printing device for tamper-proof printing on plastic cards, such as credit cards, by means of a thermal printing head and "color transmitting embossing foil."

There are 13 claims to the '350 patent, of which claims 1, 12 and 13 are independent claims and claims 2–11 are dependent

claims. The claims at issue read as follows:

1. A printing device for the production of tamper-proof printing on a plastic surface, comprising:

a thermal, nonimpact, nonembedding printing head of the kind which carries dot printing elements which are individually selectively heated and non-heated dot printing elements for printing part of a character to be printed;

a color transmitting embossing foil and means interposing said embossing foil between said selectively heated and nonheated dot printing elements and the plastic surface to be printed; and

low pressure pressing means engageable with said printing head for pressing, by selectively heated and nonheated dot printing elements, of said foil against said plastic surface to be printed.

2. A printing device according to claim 1, wherein the dot printing elements of the printing head form at least one row which extends transversely to the direction of movement of the plastic surface with respect to the printing head.

. . . .

7. A device according to claim 1, in which the low pressure pressing means press the printing head with a pressure of at least 0.2 kg./cm2 against the foil and plastic surface during printing.

8. A device according to claim 1, wherein the printing head has a surface which faces the embossing foil and plastic surface, the heating elements being on said printing head surface and projecting the farthest from said printing head surface of any other elements on said printing head surface.

. . . .

10. A device according to claim 1, in which said dot printing elements are heating elements which are controllable individually.

Each of these claims requires a "color transmitting embossing foil," as indeed do all the claims of the '350 patent. Claim 1

does not by its own terms further limit the terms "color transmitting embossing foil" to a particular construction or kind of embossing foil. Claims 11–13, however, do containing limiting language. In each of these latter claims, "color transmitting embossing foil" is defined as follows:

> [T]he color transmitting embossing foil being of the kind conventionally used with block type in high pressure hot stamping presses, said foil being a composite foil of the multilayer kind including a carrier layer, a heat softenable separating layer, a color layer separable from said carrier layer upon softening of said separating layer, and a thermoreactive adhesive layer in that order ...

Thus, in the last three claims of the '350 patent the terms "color transmitting embossing foil" are limited in the claim language to a particular construction of embossing foil containing three distinct layers on top of the carrier.

### B. *The History of the '350 Patent*

Dorner filed his patent application on February 22, 1985. Prosecution History, Defs.' Opp'n to Pl.'s Mot. for Summ.J. at A473 [hereinafter "Prosecution History"]. On August 6, 1985, an Examiner for the Patent and Trademark Office ("PTO") issued the first of two Office Actions rejecting the claims as unpatentable for a variety of reasons. With regard to claim 1, the Examiner gave both 35 U.S.C. § 112 (indefiniteness), and 35 U.S.C. § 102(a) (anticipation by prior art) as reasons for rejection, referencing devices disclosed by Osmera *et al. Id.* at A473.

In response to this Office Action, Dorner amended claims 1 and 10, added two more claims, and in the remarks following the claim amendments sought to distinguish the invention from the Osmera reference. Dorner pointed out that the Osmera reference disclosed "a printing apparatus with a thermal printhead, but arranged for printing on paper ... by using a ribbon which contains heat transferrable ink." Dorner's invention, in contrast, disclosed printing on plastic surfaces by use of "an embossing foil as a color transmitting material." *Id.* at A481.

Further elaborating on this distinction, Dorner's attorney directed the Examiner's attention to a brochure titled "A New Method of Non–Impact Printing," by AR-MOR S.A. [hereinafter "The ARMOR brochure"]. This brochure described an apparatus for non-impact printing by means of a thermal printhead and a ribbon containing heat transferable ink, "just as in the Osmera reference disclosure." Prosecution History at A481. According to Dorner, the ARMOR brochure disclosed that "it is not possible to use a conventional heat transferable ink containing ribbon for printing on the surface of a plastic card. It is instead necessary to provide a mix of a thermal transfer ink and a sublimable ink for printing on plastic cards," which had to be exposed to an infrared lamp before the ink could penetrate the surface of the card. *Id.* Dorner then explained:

> Thus, according to the prior art, printing on plastic cards with Osmera's apparatus would only be possible using such a special ribbon (having both thermal transfer ink and a sublimable ink) and an infrared lamp, that is by using a relatively expensive ribbon and an additional component (the infrared lamp) in a method which permits only relatively slow printing. These disadvantageous requirements are completely avoided by Applicant's invention defined by amended Claim 1.

*Id.* This, according to Dorner, was the teaching of prior art. Dorner then distinguished his invention over prior art as follows:

> [I]t must be regarded as surprising and not at all predictable that it is possible to use a commercial embossing foil (described in the present specification as a composite foil comprising a carrier layer, separating layer, color layer and a thermal activateable adhesive layer) for printing with a thermal printing heap on plastic surfaces. It is particularly surprising because in contrast to the embossing devices for which commercial embossing foils are designed, the impact

of a thermal printing head is extremely low.

*Id.* at A482.

On January 30, 1986, the Examiner issued his second Office Action, rejecting all of Dorner's amended claims. Claim 1, in which the invention was defined, and claims 2–12 were rejected on two grounds. First, the Examiner rejected the claims under the second paragraph of 35 U.S.C. § 112, "for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention." Prosecution History at A486. This rejection turned on the terms "color transmitting embossing foil" in claims 1 and 12, which the Examiner regarded as not clearly distinguishable from a ribbon with heat transferrable ink, and unclear because no embossing actually took place in the invention as described.

The Examiner also rejected claims 1, 6, 8, 10 and 11 on the grounds of obviousness under 35 U.S.C. § 103. The Examiner still regarded these claims as unpatentable over Osmera *et al.* prior art references: "Claim 1 will read on Osmera et al insofar as the recited structure is concerned. The thermally-sensitive transfer ribbon 50 of Osmera et al is equivalent to the recited color transmitting embossing foil." *Id.* at A487. The Examiner returned to this issue at the end of the Office Action. Regarding the ARMOR brochure, the Examiner stated, *inter alia,* that

> [n]o critical distinction is seen between an "embossing foil" and a "ribbon which contains heat transferable ink." The coloring material on embossing foils is clearly heat transferable ink. It is thermoplastic, melting in response to the presence of a heated printing member.

*Id.* at A488–A489.

Dorner responded to the January 30 Office Action on May 30, 1986. In the response, Dorner further amended the original claims and added what would become claims 11–13 in the patent. In the text of claims 11, 12 and 13, the embossing foil was described as a multilayer foil, having three distinct layers on top of the carrier.

The amended language of claim 1 did not so describe the embossing foil. In the remarks section following the claim amendments, however, Dorner specifically addressed the Examiner's characterization of an embossing foil in the latter's comments on the ARMOR brochure at the conclusion of the Office Action of January 30. Dorner explained:

> As to Examiner's comment (a) [at the end of the January 30 Office Action], both the "color transmitting foil" and the "ribbon with heat transferable ink" are multilayer foils which have a carrier layer of plastics.
>
> However, as shown on page 2 of the "ARMOR" brochure filed with the response dated 06 November 1985, the "ribbon" has a layer 2b of thermal transfer ink on the carrier layer 2a which layer 2b is a mixture of a resin with a low melting point and a dye. The resin is usually phenolic resin, maleic resin etc. as available as "Steabelite" of Hercules Powder or "Epicoat" of Shell Oil Co.
>
> In contrast, as shown in Figure 1 of the present application, the "embossing foil" has a separating layer 2 of parting or releasing material between the carrier layer 1 and the color layer 4 on which an adhesive thermal reactable layer 5 is applied. Usually a thin lacquer layer 3 is provided between the color layer 4 and the releasing layer 2. The color layer 4 is frequently formed by a metal foil. This structure of an embossing foil, as used according to the present invention, is described essentially in column 1, lines 9 to 19 of the Abe reference (US-patent 4 063 500).
>
> More specifically as to Examiner's comment (a) on Office Action page 4, the embossing foil thus does *not* contain a mixture of a resin with a low melting point and a dye as coloring material. Instead it contains a *separate* color layer, being frequently a *metal* foil, and a *separate* layer of a thermal reactive adhesive. In addition it contains a *separating layer between* the color layer and the carrier layer.

*Id.* at A496–A497 (emphasis in original).

Dorner then specifically referred to the above-quoted passage in response to the

§ 112 rejection, together with the original specification, "to give clear meaning to the term 'embossing foil.'" *Id.* at A498. Turning to the § 103 rejection for obviousness over Osmera, Dorner referenced his earlier response on the distinction between Osmera and Dorner's invention, and reiterated that

> [t]he Osmera ribbon with heat transferable ink is thus clearly *not* equivalent to Applicant's recited color transmitting embossing foil nor is the paper disclosed in Osmera substitutable by a surface of plastic material if tamper proof printing is to be achieved.

*Id.* at A499 (emphasis in original).

The prosecution history does not reveal further communications between Dorner's attorney and the PTO before the '350 patent was issued on March 17, 1987.

### III. Summary Judgment Standard

A motion for summary judgment should be granted

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–32, 106 S.Ct. 2548, 2552–57, 91 L.Ed.2d 265 (1986). Which facts are material is determined by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The duty of the court is thus to determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. In so ruling, "'[t]he district court must view the evidence in the light most favorable to the nonmoving party, and any doubt as to the existence of issues of material fact must be resolved in favor of the party opposing the motion.'" *Jonsson v. Stanley Works*, 903 F.2d 812, 816 (Fed.Cir.1990) (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1548 (Fed.Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988)).

The Federal Circuit has provided the following guidance for district courts in applying this standard to claims of patent infringement:

> Although infringement, either literal or under the doctrine of equivalents, is a question of fact, *see Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 U.S.P.Q. 328, 331 (1950), "'[s]ummary judgment is as appropriate in a patent case as in any other' where no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law." *Brenner v. United States*, 773 F.2d 306, 307, 227 U.S.P.Q. 159, 160 (Fed.Cir.1985) (quoting *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835, 221 U.S.P.Q. 561, 564 (Fed.Cir.1984)). *Thus, the granting of summary judgment will be upheld "where the claims do not 'read on' the accused structure" to establish literal infringement "and a prosecution history estoppel makes clear that no actual infringement under the doctrine of equivalents can be found." Id.; Build-ers Concrete, Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 225 U.S.P.Q. 240 (Fed.Cir.1985).

*Townsend Engineering Co. v. Hitec Co.*, 829 F.2d 1086, 1089 (Fed.Cir.1987) (emphasis added).

In the instant case, the parties have cross-moved for summary judgment on the issue of literal infringement, while Data-Card's motion seeks summary judgment of non-infringement under the "doctrine of equivalents" as well. DataCard is entitled to summary judgment of non-infringement, under the analysis in *Townsend Engineering, supra*, unless Kunz and Digicard can show that there is a genuine dispute on an issue of material fact with regard to infringement under the doctrine of equivalents.

### IV. Literal Infringement

[1] A two-step analysis is used to determine whether a patent claim has been liter-

ally infringed. The first step entails construing or interpreting the claim to determine its scope. *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed,* —— U.S. ——, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). The second step is to determine "whether each limitation of the properly construed claim[ ] is found in the accused product or process." *Id.*

"Claim interpretation, a threshold inquiry when resolving infringement, is a question of law." *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866 (Fed.Cir.1985). So is the interpretation of terms in a claim. *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579–80 (Fed.Cir.1989). In interpreting the meaning of disputed terms, the court should refer to other claims, the specification, and the prosecution history. *Jonsson v. Stanley Works*, 903 F.2d 812, 819 (Fed.Cir.1990); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d at 867. In doing so, however, a district court must hew closely to the language of the claim itself, respecting the oft-repeated maxim that "patent law 'allows the inventor to be his own lexicographer.'" *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d at 867 (quoting *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 397 (1967)). Thus, for example, the Federal Circuit "has consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet America, Inc. v. Kee–Vet Lab.*, 887 F.2d 1050, 1053 (Fed.Cir.1989) (emphasis in original) (quoting *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.1988)). Likewise, a limitation appearing in a narrow claim cannot be read into a broad claim so as to avoid infringement. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985).

These caveats limit the proper scope of claim interpretation; they do not render such interpretation impossible. "It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim." *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). Similarly, "the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985).

The issue of literal infringement in the present case, as argued and briefed by the parties, turns on the meaning of the terms "color transmitting embossing foil" appearing in claim 1 of the '350 patent. Claims 2, 7, 8 and 10 are dependent claims each of which makes explicit reference to "[a] printing device according to claim 1," thereby incorporating the terms "color transmitting embossing foil" as defined in claim 1. DataCard is entitled to summary judgment on literal infringement unless Kunz shows that Dorner did *not* limit the definition of "color transmitting embossing foil" to a three-layer construction in order to obtain claim allowance. DataCard's motion will be denied, and summary judgment entered for Kunz and Digicard, unless DataCard shows that the "color transmitting embossing foil" disclosed in claim 1 was *not* so broad in definition as to encompass the single-layered "ribbon" or "foil" containing a *mixture* of colorant and resin employed by DataCard printers. The Court notes that, although Kunz and Digicard contend that DataCard's system uses a "foil" to print on plastic cards, they do not dispute DataCard's contention that this "foil" (or "ribbon," as DataCard prefers) does not contain a three-layer construction.

On review of the record in this case, the prosecution history and the language of the '350 patent, the Court is persuaded that, during the prosecution of his patent, Dorner did indeed limit the definition of the terms "color transmitting embossing foil" in claim 1 to a particular multilayer con-

struction. Because claims 2, 7, 8 and 10 depend on the device as described in claim 1, the meaning of "color transmitting embossing foil" in claim 1 controls these claims as well. Thus, the Court finds that DataCard's printing system does not literally infringe the '350 patent, because the DataCard system does not use an embossing foil as defined in the patent.

In reaching this conclusion, the Court relies not on those limitations that Dorner placed on the terms "embossing foil" in the narrow claims of the '350 patent (claims 11–13). The Court agrees with Kunz and Digicard that to so construe the terms of claim 1 would be improper under the "doctrine of claim differentiation." *See D.M.I., Inc. v. Deere & Co.*, 755 F.2d at 1574; Defs.' Opp'n to Pl.'s Mot. for Summ.J. at 23–24.

Rather, the Court rests its conclusion on a reading of the prosecution history of the patent. Comparison of the Examiner's stated grounds for rejection of the claims and Dorner's responses shows that, in order to gain approval of the patent application, Dorner had not only to define "embossing foil" clearly but had to show that such an embossing foil would not read on prior art, such as disclosed by Osmera and the ARMOR brochure. In so doing, Dorner disavowed the contention that an "embossing foil" was like the ribbons disclosed in prior art precisely *because* the embossing foil had a three-layer structure on top of a carrier layer, rather than the mixture of inks disclosed in the ARMOR brochure or the ribbon with heat transferable ink as disclosed by Osmera. In short, the Examiner declined to approve claim 1 until Dorner had shown how a "color transmitting embossing foil"—an essential and material element of claim 1—specifically differed from prior art ribbons.

Kunz and Digicard's arguments to the contrary are not persuasive. In their Opposition to DataCard's Motion for Summary Judgment, Kunz and Digicard contend that Dorner's description of an embossing foil as a three-layer construction appeared only in the context of a response to the Examiner's discussion of the AR-

MOR brochure on pages 4 and 5 of the Office Action of January 30, 1986. *See* Defs.' Opp'n to Pl.'s Mot. for Summ.J. at 8. This contention ignores the fact that it was Dorner who, in response to the *first* Office Action, directed the Examiner's attention to the ARMOR brochure in order to distinguish the embossing foil used in his invention from the ribbon containing heat transferable ink as disclosed by Osmera. *See* Prosecution History at A481.

Kunz and Digicard make much of the argument that explanatory remarks to an Examiner in the context of a § 112 rejection do not narrow broad claims. *See* Defs.' Rep. at 3–7. Yet Dorner's remarks in response to the Office Action of August 6, 1985, in which he drew the Examiner's attention to the ARMOR brochure, were made to overcome a rejection of claim 1, as well as other claims, under *both* § 112 *and* § 102(a). Likewise, in response to the Office Action of January 30, 1986, Dorner referenced the above-quoted detailed comparison of the multilayer construction of embossing foils used in the invention and heat transferable ribbons, to overcome a second § 112 rejection *and* a rejection for obviousness under 35 U.S.C. § 103. *See* Prosecution History at A497. Thus, *Environmental Designs, Ltd. v. Union Oil Co.*, upon which Kunz and Digicard place great emphasis in their Reply brief, is distinguishable on the facts from the instant case. *See* 713 F.2d 693, 699 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (remarks made to a patent examiner to overcome a § 112 rejection, as opposed to a § 103 rejection based on prior art, do not limit the terms of a broad claim); Defs.' Rep. at 3–5.

The Court is particularly persuaded that Dorner's remarks to overcome the rejection of claim 1 under § 112 and § 103 in the Office Action of January 30, 1986 support the conclusion that Dorner limited the definition of an embossing foil. *See* Prosecution History at A498–A499. These remarks directly and indirectly referenced the specifications, as well as the detailed comparison in response to the Examiner's comments on the ARMOR brochure. Thus, to overcome the indefiniteness rejection un-

der § 112, paragraph 2, Dorner stated as follows:

"Color transmitting embossing foils" are defined in Applicant's original specification, for example at page 4, lines 13 to 21. An example of *such* a commercial embossing foil *is shown in Figure 1 and discussed in the first paragraph of the DETAILED DESCRIPTION in Applicant's specification* page 8, lines 13 to 19.... Accordingly, *the specification is submitted to give clear meaning to the term "embossing foil", or "color transmitting embossing foils", used in the claims.*

Prosecution History at A498 (emphasis added). In the specification, column 2 lines 38–44, embossing foils are defined as having a composite or multilayer construction:

Known also are so-called embossing foils. These are composite foils, which consist of a carrier foil, for example a polyester foil with a separating layer which in general contains wax, a color layer which follows the separating layer and a thermoreactive adhesive layer which follows the color layer, whereby between separating layer and color layer there is usually additionally provided a lacquer protective layer.

Figure 1 of the '350 patent, which presents a drawing of a cross-section of an embossing foil, is described in the above-mentioned passage as follows:

### DETAILED DESCRIPTION

FIG. 1 shows a commercial embossing foil formed by a composite foil, which comprises a carrier layer 1, for example of polyethylene, a separating layer 2, for example of wax or a waxlike material, a lacquer layer 3, a color layer 4 and an adhesive layer 5 which can be thermoactivated, for example at a temperature of approximately 100 [degrees] C.

If a pressing tool heated up to, for example, 120 [degrees] C. is pressed onto the carrier layer 1, then the adhesive layer 5 is activated, which causes it to connect the color layer 4 (Covered by the protective lacquer layer 3) to the material to be printed on, while the carrier foil 1 is released therefrom due to the softening of the wax layer 2.

While the specification refers to various embossing foils, such as metal foils or color foils, there is no description of the structure or construction of these foils to indicate that they do not share the three-layer construction set forth in the above-quoted passages. If these foils have a construction *unlike* the multilayer or composite embossing foils, it is not disclosed in the specification of the '350 patent. The only embossing foil described in detail in the specification contains the multilayer construction as quoted above. And it is *this* definition of an embossing foil, as set forth in the specification, that Dorner explicitly referenced to the Examiner to overcome the § 112 rejection.

The same is true in the response to the § 103 rejection, although the reference to the specification in this instance was indirect. The Examiner, in the Office Action of January 30, 1986, rejected claim 1, among other claims, as being unpatentable under § 103 on Osmera in view of the Abe and Sakurai references. In response, and to traverse this rejection, Dorner replied in pertinent part as follows:

The difference between Osmera and the present invention is discussed in the last response [of November 6, 1985]. Osmera discloses (a) a thermal printer which prints (b) on paper using (c) *a ribbon with heat transferable ink.* In contrast to the present invention Osmera (1) *does not use an embossing foil* and (2) does not print on plastic surfaces or plastic cards.

As pointed out above, the Osmera apparatus with its ribbon of heat transferable ink will not produce tamper proof printing on a plastic surface. The Osmera ribbon with heat transferable ink is thus clearly not equivalent to Applicant's *recited* color transmitting embossing foil nor is the paper disclosed in Osmera substitutable by a surface of plastic material if tamper proof printing is to be achieved.

Prosecution History at A499 (underscoring added). Here, Dorner again contrasted his

invention with Osmera, this time to overcome a § 103 rejection. That the invention disclosed the use of an embossing foil was thus essential to establish the distinction over prior art. The Court interprets the term "recited" in the remarks above to refer back to the definition of a color transmitting embossing foil set forth in response to the § 112 rejection just discussed. That definition, as has been shown, in turn referenced the specification, which described the embossing foil of Dorner's invention as having a multilayer construction. It was only after these remarks were made that the Examiner allowed claim 1.

While the Federal Circuit has cautioned district courts not to read limitations appearing in the specification into claims, *see Intervet America, Inc. v. Kee–Vet Lab.,* 887 F.2d at 1053, the Court notes that in the instant case it was *the applicant* who repeatedly referred to the specification in order to define terms describing an essential and material element of his claim. *Smith v. Snow,* relied upon by Kunz and Digicard in this regard, is therefore distinguishable. *See* 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Defs.' Rep. at 5–7. In so following the remarks of *the applicant* in the prosecution of the patent, the Court adheres to the maxim that the applicant is to be his own lexicographer. *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d at 1563; *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d at 867. Thus the Court finds that Dorner defined "color transmitting embossing foil" as having a three-layer construction in order to gain approval of claim 1 of his patent. Because the other disputed claims in this case all refer to the device described in claim 1, those claims are bound by the definition of terms appearing in the parent claim. *See Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed.Cir.1990). Since Kunz and Digicard do not dispute that DataCard's "ribbon" or "foil" does *not* have a three-layer construction, the Court finds that DataCard's printing system does not literally infringe the '350 patent. Kunz and Digicard's cross-motion for partial summary judgment must be denied.

## V. Doctrine of Equivalents

Before the Court can enter summary judgment for DataCard, however, it must consider whether DataCard's printing system actually infringes the '350 patent under the "doctrine of equivalents." *See Townsend Engineering Co. v. Hitec Co.,* 829 F.2d at 1089; *see also Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d at 1562–67 (affirming a district court's summary judgment order of no literal infringement, but vacating that part of the order after finding infringement under the doctrine of equivalents). "Under the doctrine of equivalents, infringement *may* be found (but not necessarily) if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987) (in banc) (emphasis in original) (citations omitted), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). The purpose of the doctrine is to prevent fraud upon the patent because of minor changes in an accused device that remove it from the realm of literal infringement. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). While the doctrine does not enlarge or extend the claims of a patent, "application of the doctrine *expands the right to exclude* to 'equivalents' of what is claimed." *Wilson Sporting Goods, Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 684 (Fed.Cir.) (emphasis in original), *cert. denied,* —— U.S. ——, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990).

Because a determination of equivalence is one of fact, *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. at 609, 70 S.Ct. at 856–57, on a motion for summary judgment the district court must find that the doctrine does *not* apply before it can grant the motion. *See, e.g., Townsend Engineering Co. v. Hitec Co.,* 829 F.2d at 1089. There are two limits on the doctrine of equivalents. The first is prosecution history estoppel, which bars the patentee from "recaptur[ing] through

equivalence certain coverage given up during prosecution." *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d at 870. The second limitation, not at issue in this case, bars application of the doctrine to accused devices already in the prior art at the time the patent was issued. *Id.* Both of these limitations are applied as questions of law. *Id.*

DataCard argues that the limitations Dorner placed on the definition of the terms "color transmitting embossing foil" constitute prosecution history estoppel barring application of the doctrine of equivalents in this case. The matter is not so simple. For this Court to so find, without further inquiry, would blur the distinction between claim interpretation and estoppel that the Federal Circuit has been at pains to make. *See Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d at 1564; *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d at 870–71. While this Court holds, as a matter of claim interpretation, that Dorner did indeed limit the definition of embossing foil in his invention to a multilayer construction, that holding does not mean, *ipso facto*, that an estoppel as to that element in claim 1 bars application of the doctrine of equivalents. "[W]henever the doctrine is evoked, 'a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender.'" *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d at 871 (quoting *Bayer Aktiengesellschaft v. Duphar Internat'l Research*, 738 F.2d 1237, 1243 (Fed.Cir.1984)). Moreover, in applying the doctrine, "'each limitation must be viewed in the context of the entire claim.'" *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d at 935 (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed.Cir. 1987); *see also Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1364 (Fed. Cir.1983).

Here, the prosecution history shows that the limitation Dorner placed on the definition of the terms "color transmitting embossing foil" in statements to the Examiner, to distinguish his invention from prior art, applies to only one of several elements or limitations in claim 1. Yet the meaning of that element was utterly crucial to the invention. Claim 1 of the '350 patent teaches the use of 1) a thermal, nonimpact, nonembedding printing head carrying selectively heated dot printing elements, 2) a color transmitting embossing foil selectively heated by dot printing elements, and 3) a low pressure means, to 4) produce tamper-proof printing on a plastic surface.

Comparison of these elements with the apparatus described in the ARMOR brochure shows just how central the use of an embossing foil is to the '350 patent. The ARMOR prior art apparatus discloses the use of a thermal print head containing selectively heated and non-heated micro heat sources or "dots," a thermal transfer supply in the form of a ribbon containing thermal transfer ink of a type appropriate to the particular application, and a receptor surface to which the ink is transferred through instantaneous melting by selectively applying heat from the print head to the ribbon. Prosecution History at A509–A510. The ARMOR brochure teaches that this method of non-impact printing will provide high-quality printing primarily on paper surfaces. *Id.* at A515–A516. On page 10 of the brochure, however, printing on plastic surfaces is discussed, including printing on plastic cards. It is here that the brochure teaches that a special ribbon containing a mixture of thermal transfer inks and sublimable dye-type inks may be used in conjunction with a printer equipped with an infra-red lamp downstream from the print head, to enhance penetration of the ink into the surface of the card and thereby ensure indelibility. *Id.* at A517.

This comparison shows that Dorner's use of an embossing foil rather than a prior art ribbon was indeed the "gist of the present invention." *Id.* at A498. In other respects, the invention disclosed in claim 1 of the '350 patent appears strikingly similar to the Osmera device as described in the ARMOR brochure. Yet Dorner discovered that use of an embossing foil enabled him to achieve tamper-proof printing on plastic cards without resort to the costly, special ribbons and an infra-red lamp as taught by

prior art. The substitution of an embossing foil, from the art of hot-stamping under high pressure, for the prior art ribbons as disclosed by the Osmera and ARMOR references explains why Dorner and the Examiner were at such pains to define the embossing foil claimed by the invention, and why so much of the prosecution history is taken up with distinguishing embossing foils from prior art in order to overcome rejections under § 102(a), § 103, and § 112 para. 2.

Dorner's *definition* of an embossing foil, as having a three-layer construction, was therefore critical in explaining to the Examiner what an embossing foil was, how its composition differed from that of prior art ribbons, and what the results of its use in the invention were. Only after those distinctions over prior art were made, did the Examiner allow the patent. This Court thus finds that Dorner limited his claim by this definition of an embossing foil, and that he did so to distinguish his invention from prior art and win approval of his patent. *See Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d at 871. Kunz is therefore estopped from claiming, under the '350 patent, that it has the right to exclude under the doctrine of equivalents devices such as DataCard's that do not use a multilayer foil. Because the Court finds that prosecution history estoppel bars application of the doctrine of equivalents in this case, summary judgment is entered for DataCard that its 15000 Ultima with an UltraGrafix module, UltraGrafix 800 and ImageCard printers do not infringe the '350 patent. Consistent with the foregoing analysis, this Court declines to find that the '350 patent is invalid under 35 U.S.C. § 112, and accordingly denies DataCard's motion for summary judgment on that issue.