Robert M. POWELL, Plaintiff,

v.

ALLERGAN MEDICAL OPTICS,
Defendant.

No. CV 93–4337 SVW (JRx).

United States District Court,
C.D. California.

May 6, 1994.

Robert E. Battle, Battle & Battle, Alexandria, VA, John M. White, and Mikolean Y. Morgan and James R. Longacre, pro hac vice, Longacre & White, Arlington, VA, Dennis Gary Kainen, Weisberg & Kainen, Miami, FL, for Robert M. Powell.

Steven E. Shapiro, Graham & James, William Poms, Poms Smith Lande & Rose, Los Angeles, CA, Regis E. Slutter, Burns Doane Swecker & Mathis, Alexandria, VA, for Allergan and Allergan Medical Optics.

## ORDER GRANTING SUMMARY JUDGMENT

WILSON, District Judge.

The Court hereby amends the Order Granting Summary Judgment filed May 6, 1994. The Court inadvertently numbered the headings incorrectly. This Amended Order contains the correct heading numbers.

### I. *Introduction*

Robert M. Powell ("Plaintiff") has filed the present suit alleging that defendant Allergan Medical Optics ("Allergan") has infringed United States Patent 4,536,897 (the " '897 Patent"). Presently before the Court is Allergan's motion for summary judgment on the grounds of non-infringement.

The Court finds that, as a matter of law, Allergan has not infringed the '897 Patent, either literally or under the Doctrine of Equivalents. Accordingly, summary judgement is GRANTED.

### II. *Undisputed Facts*

#### A. *Plaintiff's Patent And The History Of IOLs*

Plaintiff's '897 patent covers a type of intraocular lens ("IOL"). By the time the patent was issued in 1985, over 200 different IOL designs were available on the market. Most of the models consisted of an optic (a circular or ovoid portion used to focus light) and two haptics (limbs used to support and center the optic). In 1985, most of the IOLs on the market were "three-piece" IOLs, which means that the haptics and optics were constructed from separate material and the haptics were staked into the optics. Technology was, however, available for "one piece" IOLs, which were manufactured by milling a single piece of material into an optic and integrally attached haptics.

Prior to the time the patent was issued, surgeons employed a number of means in implanting the IOLs. One method of implantation was cutting a slight incision in the iris and "rotating" the IOL through the incision. The rotation was caused in one of two ways. First, some IOLs had "positioning" holes in the face of the optic. The surgeon could insert a tool into the positioning holes and rotate the tool. Second, surgeons could insert a tool into the crease between the optic and the haptic and "pull" the IOL around.

Both methods of rotation had shortcomings. The problem with the positioning holes was that, after implantation, scar tissue would grow over the holes and cause glare. The problem with using the crease between the haptic and the optic was that the haptics were prone to break from the rotational force.

In applying for the '897 patent, Plaintiff intended to create an IOL which could be rotated, but which would not fall subject to either of these shortcomings.

Plaintiff has alleged infringement of Claims 1, 2, and 5 through 9 of the '897 patent. Only Claim 1 is an independent claim; the other claims incorporate Claim 1. This claim has the following limitations:

> An intraocular lens useful for implantation or positioning in the chamber of an eye after capsular extraction comprising: an imperforate lens optic having an anterior face and a posterior face, the circumference of each face having a continuous curving common edge configured with at least one continuous curving axial socket recess open to said edge and faces, and haptic support means adapted for rotating the lens and centering the lens optic on the optical axis, the socket recess having a bearing surface of a size adapted to receive and accommodate in close-fitting relation by open edge-access the distal end of a surgical tool to thereby enable the lens to be rotated or dialed and thus moved by the tool in the plane of the lens for positioning of the lens in a surgical procedure.

The comments state that the purpose of the patent is to create a means of rotating the IOLs without positioning holes in the face of the optic. The comments also state

that the described IOL is to be an improvement over prior art.

### B. *Allergan's Products*

Plaintiff has alleged that five of Allergan's models infringe. These models are AMO PC–57NB, PC–57RHB, PC–57JLB, PC–58NB and PC–59NB. All five of these allegedly infringing models are manufacturing by milling down a single piece of polymethylmethacrylate ("PMMA"). The piece of PMMA is milled into a circular optic with two integrally attached haptics. The optic face is imperforate.

During the milling process, a slight recess is carved into the periphery of the optic. This recess is approximately .6mm in diameter. Allergan's experts have testified that there are two reasons for having a recess this size. First, after the milling process, the IOL is placed in a tumbler with bearings. A recess of .6mm is needed such that the bearings can fit in space between the haptic and the optic. Second, the recess has the effect of narrowing the base of the haptic and making it more flexible and thus easier for rotation.

In implanting these allegedly infringing IOLs', surgeons often insert a tool into the recess between the haptic and the optic in order to rotate the IOL through an incision in the Iris.

Allergan has several other models of IOLs, including AMO PC–24NB, PC–25NB, PC–26NB, PC–26NJB, PC–26JLB, PC–38NB, PC–43NB, PC–45NB, PC–44NB, and PC–57HB. These models, like the allegedly infringing IOLs, are milled from a single piece of PMMA. Although they do not have recesses into the optics, they are often rotated into place by inserting a tool into the crease between the haptic and the optic.

### III. *Summary Judgment*

■ The Court must grant Allergan's Motion for Summary Judgment, unless Plaintiff produces evidence from which a "fair minded jury could return a verdict" for the Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–255, 106 S.Ct. 2505, 2512–2513, 91 L.Ed.2d 202 (1986). Inferences to be drawn

from Plaintiff's affidavits and other evidence are to be viewed in the light most favorable to the Plaintiff. *Baxter v. MCA, Inc.*, 812 F.2d 421 (9th Cir.1987) *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

Furthermore, "[s]ummary judgment is appropriate in a patent case as in any other." *Barmag Barmer Machinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984).

### IV. *Literal Infringement*

#### A. *Introduction*

■ The determination of whether a patent has been infringed involves a two step analysis. The first step is to construe the patent language to establish the proper scope of the patent. *George v. Honda Motor Co.*, 802 F.2d 432 (Fed.Cir.1986); *Rain Bird Sprinkler Mfg. Corp. v. Toro Co.*, 28 U.S.P.Q.2d 1448, 1993 WL 528384 (C.D.Cal. 1993). The second step is to determine whether the allegedly infringing product falls within the scope of the patent. *Datacard Corp. v. Kunz KG*, 778 F.Supp. 544 (D.D.C. 1991).

#### B. *The Scope of the Patent*

■ Interpretation of the patent is a legal question. Accordingly, a dispute regarding the scope of a patent does not preclude summary judgment unless there is a conflict in the underlying evidence pertinent to the patent interpretation. *George*, 802 F.2d 432; *Rain Bird Sprinkler Corp.*, 28 U.S.P.Q.2d 1448, 1993 WL 528384.

■ In construing patent claims, the Court should look to the language of the claims, the prosecution history, the prior art and the specifications. *Jennmar Corp. v. Pattin Mfg Co.*, 20 U.S.P.Q.2d 1721, 1724, 1991 WL 288176 (S.D.Ohio 1991). The language should be construed in its ordinary sense, or as it would be used by one of ordinary skill in the art. *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861 (Fed.Cir.1985). If the inventor used words as terms of art, they should be understood as used by the inventor. *Rain Bird Sprinkler*, 28 U.S.P.Q.2d at 1454, 1993 WL 528384 at *9; *Deuterium Corp. v. United States*, 11

U.S.P.Q. 1481, 1485 (Ct.Cl.1989). If complex scientific principles are involved, the Court may hear the testimony of experts in the art to see how they would interpret the claim. *Moeller v. Ionetics, Inc.,* 794 F.2d 653 (Fed. Cir.1986).

In the present case, the parties do not dispute the relevant underlying facts. Furthermore, no expert testimony is needed to clarify complex scientific principles. Accordingly, the Court interprets the patent on the present record.

The parties dispute the meaning of Claim 1 in three respects. First, the parties dispute whether the language "continuous curving" limits the patent to three-piece IOLs. Secondly, the parties dispute whether the axial socket recess must be entirely contained within the circumference of the optic. Third, the parties dispute whether the "close fitting" language means that the surgical instrument must fit "snugly" within the socket recess, or whether it just means that the surgical tool must fit closely enough such that it can rotate the IOL.

### 1. *Whether Plaintiff's Patent Applies To One–Piece IOLs*

■ Allergan argues that the patent only applies to three-piece IOLs. Plaintiff, on the other hand, argues that the patent applies to one-piece as well as three piece IOL. The patent does not mention one-piece IOLs. The illustrations in the patent depict three-piece IOLs.

The root of Allergan's interpretation is the language "the circumference of each face having a continuous curving common edge." According to Allergan, this language means that there must be a continuous curving edge which extends around the entire optic. One-piece IOLs have haptics and optics which are cut from a single piece of material. Therefore, the optic edge is interrupted where the haptic meets the optic, and the edge of the optic is therefore not continuous.

Plaintiff, on the other hand, argues that the phrase "continuous curving" does not mean that the circumference is unbroken. Instead, it means that the circumference of the optic is continuously curved and is with-

out cusps or corners. In support of this interpretation, Plaintiff points out that, if the patent were only to apply to IOLs with unbroken circumferences, it would, in effect, apply to no IOLs at all. In three-piece IOLs, the optic circumference is broken where the haptics are attached to the optic. The only difference between three-piece and one-piece IOLs is the manner in which the haptic is attached to the optic.

The Court finds that, for the reasons stated, Plaintiff's interpretation is the better interpretation. Accordingly, Plaintiff's patent applies to one-piece as well as three-piece IOLs.

### 2. *Whether The Socket Recess Must Be Contained Within The Circumference Of The Optic*

■ Allergan argues that Plaintiff's patent only applies where IOLs have socket recesses which are contained entirely within the circumference of the optic. Plaintiff claims that the patent applies when a small recess in the optic and the edge of the haptic together form a socket recess.

The relevant language of the claim recites that the IOL is comprised of:

[A] lens optic having an anterior face and a posterior face, the circumference of each face ... configured with at least one continuous curving axial socket recess open to said edge and faces.

Construing this language in accordance with its common meaning, the Court finds that the patent is limited to IOLs which have a socket recess entirely within the circumference of the optic.

The claim applies where there is an "optic having an anterior face and a posterior face, the circumference of *each face* ... configured with *at least* one ... socket recess." (Emphasis added) In this context, the phrase "each face" refers to the faces of the optic. The phrase "at least one" modifies the number of socket recess which must be found in the optic faces. In other words, the patent requires that the circumference of the optic contain not less than one socket recess.

It is only when there is a socket recess entirely within the scope of the optic that this

requirement is met. If the circumference is formed with a slight recess which, when coupled with the edge of a haptic, forms a socket recess, the circumference does not contain at least one socket recess—it contains a mere fraction of a socket recess. In other words, Plaintiff's proffered interpretation of the patent effectively ignores crucial language in the patent.

In brief, the Court finds that Plaintiff's patent only applies where the IOL has a socket recess entirely within the circumference of the optic.

### 3. *Whether The Patent Requires A "Snug Fit."*

█ Allergan argues that the use of the language "close fitting" in the claim must be interpreted as requiring a "snug fit" between the tool used to rotate. Allergan has not stated precisely what it means by "snug fit."

According to Allergan, the original patent application did not include the language "close fitting." The patent examiner rejected the application, stating that the patent was rejected as "unpatentable over the Simcoe lens ... in view of Ong." Simcoe was a lens with holes in the optic which could be used to rotate the lens into place. Ong was a lens with incisions in the edge of the optic. The combination of the two, Allergan argues, amounts to an IOL with incisions in the side which could be rotated into place. The patent examiner rejected Plaintiff's original application, because it amounted to nothing more than this Ong–Simcoe combination. Plaintiff then added the "close-fitting" language to the claim, and the patent examiner accepted the claim as revised. In light of this history, Allergan argues, the language "close fitting" must be construed as "snug fit", or else it would have no meaning at all.

A careful reading of the patent application reveals, however, that the patent officer's concern was not merely the size of the socket recesses—it was also the shape of the recesses. In amending the claim, Plaintiff added a number of new clauses. He added the language "continuous curving," to modify the axial socket recesses; he added that the socket recesses must be "of a size adapted to receive and accommodate in close-fitting re-

lation by open edge-access"; and, he added the language "to thereby enable the lens to be rotted or dialed and thus moved by the tool in the plane of the lens." The remarks state that Plaintiff's patent is distinct from the Ong insofar as Ong does not have a continuously curved socket recess. Instead, Ong had a rectilinear aperture. This aperture could be turned slightly with tweezers or a fork. The socket recess described in Plaintiff's patent was "functionally" unique, because it permitted the full rotation of the IOL with a standard surgical tool such as a Sinskey or iris hook and not tweezers.

The language "close fitting" must be understood in the context of the entire claim amendment. The phrase was not added to distinguish the Ong–Simcoe model merely in terms of the size of the respective recesses. The language also has a clear functional significance: the edges of the socket recess have curves rather than corners so they do not interfere with the rotation of the lens; and, the relationship between the socket recess and a surgical tool must be close fitting such that the surgical tool can be used to rotate the IOL on the plane of the lens.

In this context, the Court is mindful that the language "close fitting" cannot be read out of the patent—not every recess which can be used for the rotation of an IOL amounts to a "close fitting" recess. Nevertheless, the Court finds that whether a particular recess is "close fitting" is a legitimate factual inquiry. The Court sees no reason to interpolate the language "snug fit" into the "close fitting" language of the patent.

### C. *The Facts*

█ The second step of the infringement analysis—determining whether Allergan's product falls within the scope of Plaintiff's patent—is a factual inquiry. At trial, Plaintiff has the burden of proof. *Jennmar,* 20 U.S.P.Q.2d 1721, 1991 WL 288176. In order to meet this burden, Plaintiff will have to prove that the allegedly infringing product falls under the ambit of each of the limitations of Plaintiff's patent. *Abbott Laboratories v. Pacific Biotech, Inc.,* 19 U.S.P.Q.2d 1678, 1991 WL 210904 (S.D.Cal.1991). Thus,

in order to defeat the present motion, Plaintiff must produce evidence which could convince a reasonable juror that Allergan's allegedly infringing product satisfies each of the claim elements.

Allergan has conceded that all of the allegedly infringing models have imperforate lenses with anterior and posterior faces and haptic support means adapted for rotating the lens and centering the lens on the optical axis. Furthermore, Plaintiff's expert, Dr. Suyano has testified that Allergan's models are configured with a continuous curving common edge, as this term is understood by the Court.

Plaintiff has also produced evidence that the models have recesses which are approximately .6mm in diameter, and that a surgical tool such as an iris hook may be inserted into these recesses for the purpose of dialing the IOL into the eye. Plaintiff has also produced evidence that iris hooks used in rotating the IOLs range in sizes up to .5mm. Based upon this evidence, the Court finds that there is a genuine factual issue as to whether Allergan's socket recesses accommodate surgical tools in "close-fitting relation."

Plaintiff has, however, conceded that the socket recesses in Allergan's IOLs are formed in part by the haptic and in part by the optic. Because the Court has found that Plaintiff's claim is limited to IOLs which have a socket recess entirely within the optic, the Court must, in light of Plaintiff's concession, rule that, as a matter of law, there is no literal infringement.

## V. Doctrine of Equivalents

### A. The Doctrine

Despite the fact that Plaintiff may not establish literal infringement, Plaintiff argues that he can establish infringement under the Doctrine of Equivalents. The Doctrine of Equivalents has been developed to prevent infringers from making minor changes in a patent to escape infringement liability. *Datacard*, 778 F.Supp. at 553. Infringement under this doctrine exists if Plaintiff proves that the allegedly infringing device performs substantially the same overall function, in substantially the same way, to obtain substantially the same overall result as the claimed invention. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931 (Fed. Cir.1987) *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). The purpose of the doctrine is to prevent competitors from appropriating the "essence of an invention while barely avoiding the literal language of the claims." *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed.Cir.1991).

Substantial equivalency is a question of fact. *Pennwalt*, 833 F.2d at 936. However, in order to avoid summary judgment, Plaintiff must produce evidence which establishes that the allegedly infringing product possesses each element of the patent claim or its substantial equivalent. *Id.* at 936. Not only must Plaintiff produce particularized testimony establishing substantial similarity in terms of all three elements of equivalence, but Plaintiff must also produce "linking argument" explaining precisely why the allegedly infringing device is substantially similar. *See Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1426 (Fed.Cir. 1989) (finding that case should not have been submitted to the jury, because "[e]ven granting that there was adequate testimony on substantial identity of function, means and result, no testimony reasonably served to articulate the comparison.").

Although the issue of "substantial equivalency" generally involves a fact-specific analysis, several clear principles have emerged. First in cases where a patent arises in a crowded field, the scope of protection afforded to Plaintiff is limited. *Gardner v. Ford Motor Co.*, 17 U.S.P.Q.2d 1177, 1190, 1990 WL 272011 (W.D.Wash.1990). Second, where the allegedly infringing product poses an improvement over the patent claim, it should not be found infringing under the Doctrine of Equivalents. *Fairfax Dental v. Sterling Optical, Corp.*, 808 F.Supp. 326 (S.D.N.Y.1992). Finally, Plaintiff may not obtain, through the Doctrine of Equivalents, protection over designs which Plaintiff could not have patented directly. *Wilson Sporting Goods, Co. v. David Geoffrey & Assoc.*, 904 F.2d 677 (Fed.Cir.1990).

### B. *Plaintiff's Evidence*

As discussed above, the allegedly infringing IOLs potentially meet all of the limitations of the '897 patent with the exception of one: the requirement that they have a socket recess within the periphery of the optic. It is true that the allegedly infringing IOLs have a recess, but even assuming *arguendo* this is a "socket recess", it is bordered in part by the optic and in part by the haptic. Accordingly, the issue for purposes of the Doctrine of Equivalents is whether the recess bordered in part by the haptic and in part by the optic is substantially the same as an entirely optic recess.

Plaintiff has offered his own deposition testimony, as well as the testimony of two experts, Dr. Suyano and Dr. Gilmore, to establish that Allergan's recesses are substantially the same as Plaintiff's recesses.[1] Dr. Suyano is an engineer specializing in the manufacture of IOLs. He has never implanted an IOL in a human. Dr. Gilmore is a surgeon who has, over many years, implanted hundreds of IOLs. He does not specifically remember implanting any of the allegedly infringing models.

Plaintiff and both of his experts have stated in their depositions that one impetus behind Plaintiff's invention was the need for a means of rotating the IOLs without harming the haptics. Prior to Plaintiff's invention, IOLs could be rotated by placing a tool in positioning holes in the middle of the IOLs. In the alternative, the tool could be inserted between the haptic and the optic. The problem with this latter method was that, when pressure was applied to the base of the haptic, the haptic was in danger of breaking. The ingenuity of Plaintiff's patent was that it provided a means of rotating the IOLs without applying any pressure to the base of the haptic and, at the same time, without requiring the use of positioning holes. The recesses accomplished this because the surgical tool could be inserted into the circumference of the optic. All rotational force was directed into the body of the optic; and no pressure needed to be placed on the haptic.

Both experts also testified that the allegedly infringing IOLs may be inserted by rotation. In order to perform this rotation, a tool is inserted into the recess between the optic and the haptic. Because of the relative dimensions of the tool and the recess, force is applied to both the optic and the haptic during rotation.

Dr. Suyano testified that the haptic surface serves primarily as a bearing edge. In his opinion, the recess is deep enough in the optic such that a surgeon could use the recess to rotate the IOL even if there were no haptic bordering the optic. Rotating in such a manner would, however, be extremely difficult because the tool would constantly slip out of the recess.

Dr. Gilmore could not pin down precisely where the tool fits into the recess between the optic and the haptic. He testified that the easiest way to rotate is by pulling "tangentially" to the circumference of the optic. Pulling at such an angle applies the maximum torque. Dr. Gilmore also testified that it would be unwise to rotate the IOLs by pulling exclusively on the haptics. He claimed that doing so would risk haptic breakage. Because he could not specifically remember inserting any of the allegedly infringing lenses, the fear of haptic breakage derived from experience with IOLs in general rather than knowledge that Allergan's haptics may, in fact, break.

Finally, although both experts testified that, in rotating the allegedly infringing IOLs force is distributed between the optic and the haptic, neither was able to quantify the distribution. More importantly, neither expert testified as to the effect the force distribution had upon protecting the haptic during rotation. In other words, neither expert was able to testify that, without the recess, there would be a risk of haptic breakage; nor could they testify that, because of the recess, enough force is directed into the optic such that the haptic protected.

On the other hand, Allergan offered the unrebutted evidence that the purpose of the

---

1. The Court ordered the live testimony of the experts as a means of supplementing the deposition testimony. The Court needed to hear this live testimony in order to better understand the experts' positions as well as the foundation upon which the testimony was based.

recess was to increase the flexibility of the haptics. Furthermore, Allergan offered evidence that it has several models of IOLs which are identical to the allegedly infringing IOLs, except for the fact that they have no recess in the optic, and which are rotated in precisely the same manner as the allegedly infringing IOLs.

### C. Analysis

Plaintiff's evidence is insufficient to convince a rational trier of fact that Allergan's IOLs are substantially the same as the IOLs described in Plaintiff's patent. Not only is there insufficient evidence to establish that the recesses on the infringing IOLs perform substantially the same overall function, in substantially the same way, to obtain substantially the same overall result as the recesses described in Plaintiff's patent; but there is absolutely no testimony "reasonably articulating the comparison." *Lear Siegler,* 873 F.2d at 1426.

The novelty of Plaintiff's recesses were not merely that they established a means of rotating IOLs—this had been done long before Plaintiff filed for his patent. Instead, Plaintiff's recesses provided a means of doing so without the use of positioning holes and without risking damage to the haptics. Plaintiff's recesses protected the haptics because they were entirely within the scope of the optic and, accordingly, all rotational force was applied to the optic and none was applied to the haptic.

In other words, the function performed by Plaintiff's recesses is receiving the end of a surgical tool for purposes of rotation. The manner in which Plaintiff's recesses do this is by directing all of the rotational force into the body of the optic. The result is rotation of the IOLs without haptic breakage.

Plaintiff's evidence fails to address these three aspects of the *Pennwalt* test. Instead it amounts to nothing more than the statement that, because Plaintiff's and Allergan's recesses are both used to rotate the IOLs, and because Allergan's recesses direct some of the rotational force into the optic, the two types of recesses perform the same function in the same manner to achieve the same result.

But, the mere fact that both recesses can be used to rotate the IOLs does not mean that they do so in the same manner. The two types of recesses can only be said to do so in the same manner if they both serve to protect the haptics by directing rotational force into the body of the optic. There is no evidence before the Court which would support a jury finding that the recesses in Allergan's IOLs do so.

Although Plaintiff has produced evidence that rotational force is distributed between the haptic and the optic, Plaintiff has failed to quantify this distribution or show that it has a qualitative significance. For example, there is no testimony that, because of the recess, the optic absorbs enough rotational pressure such that there is a reduction in risk of haptic breakage. Nor has Plaintiff offered testimony that Allergan's haptics would be in risk of breaking if there were no recess. In fact, Allergan has offered unrebutted evidence to the contrary. Allergan has a number of IOLs, which contain no recesses, and which are rotated by applying pressure entirely on the haptic. Plaintiff has offered no evidence that the haptic breakage rate is any higher when there is no recess than when there is a recess.

In short, there is absolutely no testimony articulating precisely why the force distribution of the recesses in the allegedly infringing IOLs is substantially the same to the force distribution in Plaintiff's recesses. Similarly, Plaintiff has produced no evidence whatsoever to rebut Allergan's evidence that the recesses have no significance whatsoever in terms of accomplishing a safe rotation.

No rational trier of fact could, upon the evidence presented, conclude that the recesses in the allegedly infringing IOLs are substantially the same as the recesses described in Plaintiff's patent. Accordingly, no rational trier of fact could find infringement under the Doctrine of Equivalents.

### VI. Plaintiff's Motion To Stay

Plaintiff has filed a motion to stay issuance of the present judgment pending the patent office's reconsideration of the validity of Plaintiff's patent. Because the Court's pres-

**1226**

ent judgment rests upon a finding of non-infringement, this motion is DENIED.

VII. *Conclusion*

For the reasons stated, Allergan's motion for summary judgment on the grounds of non-infringement is GRANTED.

Plaintiff's motion to stay the present proceeding is DENIED.

All other outstanding motions are hereby VACATED.

IT IS SO ORDERED.

### JUDGMENT

Pursuant to the Court's order filed herewith, it is ORDERED ADJUDGED and DECREED that judgment be entered in favor of defendant Allergan Medical Optics with costs. Plaintiff Robert M. Powell shall take nothing by this action. The Court declares that defendant's intraocular lens models PC–57NB, PC–57RHB, PC–57JLB, PC–58NB and PC–59NB do not infringe United States patent 4,536,897.

IT IS SO ORDERED.

